**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AARON M. WILLOUGHBY,**<br><br>Plaintiff,<br><br>v.<br><br>**MICHAEL J. ASTRUE,** Commissioner of Social Security<br><br>Defendant. | ) | No. 11 C 7854 |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Aaron Willoughby ("Willoughby") brought this action against Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), seeking review of the denial of his application for disability insurance benefits. The parties have filed cross motions for summary judgment. For the reasons that follow, Willoughby's motion is granted and this case is remanded to the Social Security Administration for proceedings consistent with this opinion.

I.

**A. Procedural History**

In January 2009, Willoughby applied for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 416(I), 423. Willoughby contended that he had been

disabled since Aug. 3, 2001, as a result of gastroparesis[1] and pyloric stenonis.[2]

His claim was denied on April 6, 2009. He filed for reconsideration, which was denied on Aug. 26, 2009. He then requested a hearing, which was held on April 8, 2010. Administrative Law Judge Marlene R. Abrams issued her ruling denying Willoughby's claim on May 15, 2010. Willoughby filed a request for review, which was denied by the Social Security Administration's Appeals Council on Sept. 30, 2011. Accordingly, ALJ Abrams' ruling is the final decision in this case.

**B. Hearing Testimony**

Willoughby is a 39-year-old man who last worked in 2001 as a self-taught auto mechanic for his father's business. He also briefly worked as the manager of a video game store for six months in 1999 and 2000. He was last insured on Dec. 31, 2006.

Willoughby testified at the April 8, 2010, hearing that he vomits after eating and that he did so all the time from August of 2001 to the end of 2006. Although he has been diagnosed with

---

[1] Gastroparesis is a condition that reduces the ability of the stomach to empty its contents. It causes nausea, vomiting, and dehydration and can lead to excessive weight loss. Gastroparesis, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001342/ (last visited July 5, 2012).

[2] Pyloric stenosis is the narrowing of the opening from the stomach into the small intestine. *Pyloric stenosis*, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001965/ (last visited July 5, 2012).

gastroparesis and pyloric stenois, doctors have not determined the cause of his inability to keep food down.

Willoughby testified that he weighed about 195 pounds in 2000, but his weight dropped to 160 or 170 pounds in 2001, and dropped to 135 pounds in 2003, when he had his first feeding tube surgically inserted. It was removed three or four months later because of pain. In 2004, Willoughby said, he weighed about 125 to 130 pounds. At the time of the hearing, Willoughby, who is five feet, nine inches tall, weighed about 130 pounds.

After the feeding tube was removed, Willoughby had a subclavian mediport implanted to receive IV fluids. He gets fluids through the tube about once a week, depending on his potassium levels. Willoughby had another feeding tube inserted in 2010, but it had to be removed two weeks later because it was causing him pain.

Describing his symptoms from 2001 to 2006, Willoughby testified that he usually went all day without eating and ate at night when his wife got home because he has no sense of taste and cannot tell if food is rotten. He had a colonoscopy in 2000, and since then, he is never hungry and will not eat unless someone tells him to eat. His bowel movements became unpredictable after his gall bladder was removed in 2001. He said he was extremely weak and fatigued, and took naps of two to three hours each day.

Willoughby said he could walk only about 200 feet before having to sit down and take a break and he experienced dizziness upon standing. Although he was fatigued, he was able to take care of his personal grooming most of the time. There were times when he became so dehydrated he could not function at all. Willoughby said he would not have been able to do a totally sedentary job for eight hours a day because he was too fatigued and because if he ate anything, he would be in pain.

The Commissioner’s medical examiner, Dr. Ashok Jilhewar, testified that he disagreed with the diagnosis of gastroparesis and pyloric stenosis, and did not believe that any of Willoughby’s doctors knew what was really causing his symptoms. Dr. Jilhewar pointed out that Willoughby had a normal gastric emptying study on May 10, 2002, which in Dr. Jilhewar’s opinion ruled out a diagnosis of gastroparesis.

Dr. Jilhewar opined that the cause of Willoughby’s disorders was psychiatric rather than physical, but his doctors diagnosed him with physical ailments because insurance companies do not pay toward treatment for psychiatric diseases. Dr. Jilhewar pointed out that Willoughby was considered bulimic at one time, apparently by doctors at the Mayo Clinic. Willoughby testified that doctors at the Mayo Clinic did suggest that he was making himself vomit, but he denied being bulimic and said he vomited because the food in his stomach was causing him pain. Willoughby

said he had seen several psychiatrists over the years, but denied having any psychiatric disorders.

ALJ Abrams inquired of Dr. Jilhewar as to whether Willoughby's history of weight loss would meet or equal a listing. Dr. Jilhewar testified that Willoughby did not fall under Listing 5.08[3] for weight loss due to a digestive disorder because he did not fall below 115 pounds and his body mass index ("BMI") did not fall below 17.5.[4] Dr. Jilhewar said that if Willoughby's BMI was consistently low, then his opinion would be different. Dr. Jilhewar testified that beginning in August 2009, Willoughby experienced persistently low levels of serum potassium, or hypokalemia, which can cause cardiac arrhythmia. The medical records did not reveal the cause of this ailment, Dr. Jilhewar said. Dr. Jilhewar said that ailment would have equaled listing 5.08 for malnutrition at that time.

Dr. Jilhewar opined that from 2001 through the end of 2006, Willoughby was capable of sedentary work with certain restrictions, including certain postural limitations. Dr.

---

[3] Listing 5.08 is as follows: "Weight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6–month period." 20 CFR Pt. 404, Subpt. P, App. 1.

[4] In fact, as will be discussed below, Dr. Jilhewar erred in determining that Willoughby's body mass index never fell below 17.5.

Jilhewar also opined that Willoughby should avoid machinery and heights because of his bouts of dizziness.

Thomas Dunleavy, the vocational expert, testified that Willoughby was not able to perform his past work as an auto mechanic. ALJ Abrams asked Dunleavy questions based on the physical residual functional capacity assessment performed by state agency doctor Solfia Saulog. Dr. Saulog determined that Willoughby could occasionally lift 20 pounds, could frequently lift 10 pounds, and could stand or walk for two hours in an eight-hour workday. Dr. Saulog did not place any postural limitations on Willoughby's ability to work. Dunleavy testified that there were unskilled light or sedentary positions in the Chicago metropolitan area that Willougby could perform, including as an assembler, sorter, and visual inspector. Dunleavy testified that even with the additional limitations suggested by Dr. Jilhewar, Willoughby could perform these jobs.

Willoughby's attorney and ALJ Abrams inquired as to some limitations placed on Willoughby by his treating physician, Dr. M.K. Harney. Dunleavy testified that if Willoughby would have to miss two days of work each month, as Dr. Harney predicted, that would be "inconsistent with the acceptable standards for unskilled work." Additionally, if Willoughby was required to take two 20 minute breaks at unpredictable times, that would

require a special accommodation. The same was true of Willoughby's need for frequent and quick access to a restroom.

**C. The ALJ's Ruling**

In ruling on Willoughby's claim, ALJ Abrams employed the five-step evaluation process for determining whether a claimant is disabled. This requires a determination of: (1) whether the claimant is presently employed; (2) whether the claimant's impairments or combination of impairments are severe; (3) whether the claimant's impairments meet or medically equal a listed impairment that the Social Security Administration has found to be disabling; and if not (4) whether the claimant has the residual functional capacity to perform his past work; and if not (5) whether the claimant is unable to perform any other work in the national economy. 20 C.F.R. § 404.1520(a). An affirmative answer at step three or step five results in a finding that the claimant is disabled. *Stein v. Sullivan*, 892 F.2d 43, 44 n.1 (7th Cir. 1990). A negative answer at any point, other than step three, ends the inquiry and means the claimant is not disabled. *Id.* (internal citations omitted). The claimant has the burden of proof through step four; it then shifts to the Commissioner at step five. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

ALJ Abrams found that Willoughby was last insured on Dec. 31, 2006. He did not work from the alleged onset date of Aug. 3, 2001, through Dec. 31, 2006. Through his date last insured, he

had the following ailments: gastroparesis/gastrointestinal disorder of an unknown cause, pyloric stenosis, and bulimia.

Through the date last insured, ALJ Abrams found, Willoughby did not have an impairment or combination of impairments that met the criteria of a listing. ALJ Abrams determined that no treating or examining physician had found that Willoughby suffered disorders equivalent in severity to a listed impairment. In particular, as to Listing 5.08, weight loss due to any digestive disorder, ALJ Abrams relied on Dr. Jilhewar's opinion that the medical records showed that Willoughby had not had a BMI of less than 17.5, calculated on at least two occasions 60 days apart within a consecutive 6-month time period. She also cited Dr. Jilhewar's testimony that Willoughby's BMI was 19.4. It appears, however, that the ALJ interpreted this testimony to mean that Willoughby's BMI was higher than 19.4 throughout the relevant period, while Dr. Jilhewar based the 19.4 figure on Willoughby's weight at the time of the hearing. (Admin R., 21, 95.)

Considering all the evidence in the record, ALJ Abrams found that Willoughby had the residual functional capacity to lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally. He could stand or walk for a total of two hours in an eight-hour work day, and sit for the remaining hours.

ALJ Abrams then recounted Willoughby's testimony and acknowledged that under Social Security regulations, a claimant's statements about the intensity and severity of his ailments could not be discounted solely because they are not substantiated by the objective medical evidence. *See* Social Security Ruling 96-7p. ALJ Abrams then added:

> After careful consideration of the evidence, I find the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.[5]

(Admin R., 22.)

ALJ Abrams then recounted various portions of the medical record. These records, essentially, show that Willoughby's ailments have puzzled doctors. Although, as Dr. Jilhewar testified, gastric emptying studies have been normal or borderline normal, doctors have suggested that Willoughby might be suffering from idiopathic gastroparesis.[6] At other times, however, doctors

[5] As will be discussed, this cryptic and unhelpful bit of boilerplate has been the subject of sharp criticism by the Seventh Circuit. *See Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012).

[6] On July 8, 2002, Dr. Robert Mosley informed Dr. Harney that despite the fact that Willoughby's gastric emptying study was unremarkable, his symptoms and the endoscopic findings were highly suggestive of gastoparesis. (Admin. R., 494.)

suggested the problem might be psychiatric in nature.[7] She noted that Dr. Harney completed an assessment of Willoughby in April 2009. In it, Dr. Harney said that Willoughby suffered from gastroparesis, which interfered with his ability to perform routine, repetitive tasks and meet deadlines. Dr. Harney said that Willoughby could sit for more than two hours at time, stand for one hour at a time, and perform both activities for a total of about four hours in a workday. He opined that Willoughby could lift up to 20 pounds occasionally and 10 pounds frequently, but would need to take about three unscheduled bathroom breaks each day, as well as two additional twenty minute breaks per day in order to lie down and rest.

ALJ Abrams gave "minimal weight" to Dr. Harney's assessment because the evaluation form indicated that he began treating Willoughby on his date last insured, and it was not clear from the assessment whether Dr. Harney believed that Willoughby had those limitations from 2001 through 2006. She added, "moreover, the claimant's medical records from that time period do not support Dr. Harney's findings with regard to the claimant's mental work

---

[7] Gastroenterologist Richard Rotnicki, for example, suggested a "functional" or psychiatric origin for the disorder in August 2003, given that a physical cause seemed to have been excluded. (Admin R., 244.) On one of Willoughby's frequent emergency room visits, on Feb. 27, 2007, Dr. Paul Toofan concluded that Willoughby "clearly ha[d] psychiatric issues" after Willougby told him he was afraid he was going to stop breathing on his own, so he could not sleep. (Admin. R., 297.)

limitations, and those records do not even clearly establish that the claimant suffered from gastroparesis, or pyloric stenosis, as he claims." (Admin. R., 24.)

ALJ Abrams then summarized Dr. Jilhewar's testimony and noted his belief that Willoughby's symptoms were caused by a psychological disorder. She noted, however, that there was only minimal evidence in the record to support this, and "[a]s such I do not find that the claimant has any medically determinable mental impairment." (Admin. R, 25.) The ALJ additionally found, however, that although Willoughby had consistently complained of abdominal pain and vomiting from 2001 through 2006, "numerous diagnostic tests during those years have not yielded especially severe diagnoses." (*Id.*) She noted the unremarkable gastric emptying studies, and pointed out that Willoughby had instances of non-compliance, which detracted from his credibility.[8]

ALJ Abrams gave significant weight to the portion of Dr. Jilhewar's testimony dealing with the diagnostic findings in the medical record, although she disagreed with his conclusion that Willoughby was capable only of sedentary work. Instead, she found he was capable of light exertion. While he could not longer perform his past work, there were a significant number of unskilled

[8] This is apparently a reference to a treatment note made by Dr. Joseph Kokoszka, who said Willoughby had exhibited "poor compliance" because he failed to follow-up with recommended small intenstine mobility studies. (Admin R., 319.)

jobs which Willoughby could perform, including as an assembler, visual inspector, or sorter. Even if Dr. Jilhewar's suggested limitations were taken into account, Willoughby would still be able to perform this jobs, the ALJ found.

II.

In reviewing the Commissioner's final decision, I must determine whether it is "supported by substantial evidence and based on the proper legal criteria." *Briscoe v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005) (internal citations omitted). Substantial evidence is that which a reasonable mind might accept to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401 (1972). The Seventh Circuit applies a deferential standard of review to the ALJ's ruling, meaning that I should not substitute my judgment for that of the ALJ or re-weigh the evidence. *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). The ALJ is not required to address every piece of evidence, but must provide a "logical bridge" between the evidence and conclusions so that I may address the validity of the agency's findings and provide meaningful review. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010).

III.

On appeal, Willoughby argues that ALJ Abrams erred in her step two finding when she found that he had bulimia, but did not find that he has hypokalemia or was underweight. He also argues

that the ALJ erred in not finding him disabled at step three. Specifically, he asserts that Willoughby should have been assessed as equaling Listing 5.06 for involuntary weight loss[9] and Listing 5.08 for weight loss due to a digestive disorder. Willoughby additionally argues that the ALJ erred in finding that he was capable of performing work in the national economy. I will address each argument in turn.

**A. Step Two and Three Findings**

Willoughby argues — and the Commissioner agrees — that Dr. Jilhewar erred when he said that Willoughby never had a BMI of less than 17.5 on at least two evaluations at least 60 days apart within a consecutive 6-month period. In fact, Willoughby's BMI fell below 17.5 on at least four occasions: on Nov. 25, 2003; Oct. 22, 2004; Jan. 4, 2005; and Oct. 5, 2006. Willoughby's BMI was at 17.0 on Oct. 22, 2004, and at 17.3 on Jan. 4, 2005, and both sides agree that at that point in time Willoughby satisfied the requirement for Listing 5.08. Additionally, although Dr. Jilhewar testified that Willoughby's BMI was 19.4 based on his

[9] Listing 5.06 is for inflammatory bowel disease (IBD) and can be met in several ways, including by involuntary weight loss of at least 10 percent from baseline and the need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a venous catheter. 20 CFR Pt. 404, Subpt. P, App. 1. Willoughby argues that he equaled this listing because of his involuntary weight loss and his periodic need for nutritional supplementation, but he fails to adequately develop this argument.

stated weight at the time of the hearing, it was in fact below 19.4 on numerous occasions between late 2002 and mid-2006.

Nonetheless, the Commissioner contends that Dr. Jilhewar's misreading of the record was harmless error. The Commissioner argues that even if Willoughby met Listing 5.08 as of Jan. 4, 2005, he cannot argue that he met the listing at any time after that date. This dooms his claim, the Commissioner contends, because Willoughby must show that he was continuously disabled from his date last insured, Dec. 31, 2006, until twelve months before he applied for benefits, or Jan. 27, 2008.[10] The Commissioner, however, does not elaborate on his reasons for believing that Willoughby cannot meet this requirement.

Willoughby must satisfy several statutory requirements in order to receive benefits. First, he must show that he was disabled prior to the expiration of his coverage on Dec. 31, 2006. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011) (citing 20 C.F.R. § 404.140)). Additionally, the statutory scheme requires that Willoughby's condition be continuously disabling from the time of onset during insured status to the time of application for benefits, if the individual applies for benefits for a current disability after the expiration of insured

[10] The record is unclear as to Willoughby's filing date, but he apparently completed his application for benefits on Jan. 27, 2009. (Admin R., 161).

status. *Flaten v. Sec. of Health and Human Servs.*, 44 F.3d 1453, 1460 (9th Cir. 1995); *see Henry v. Gardner*, 381 F.2d 191, 195–96 (6th Cir. 1967). Combined with the rule that benefits may be paid only for the twelve months immediately before the application is filed, *see* 20 C.F.R. § 404.621(a)(1), this means that Willoughby must show that he was continuously disabled either before or beginning on Dec. 31, 2006, through Jan. 27, 2008. *See Ryan v. Barnhart*, No. 04 C 0584, 2004 WL 2038848, at *1 n.1 (N.D. Ill. Aug. 27, 2004).

ALJ Abrams, however, did not consider the issue of continuous disability. Rather, she considered whether Willoughby could establish that he was disabled prior to his date last insured. ALJ Abrams focused on Willoughby’s treatment records from Aug. 3, 2001, through Dec. 31, 2006, and concluded that he was not under at disability at any time during that time period. Based on that conclusion, she denied his application for benefits. This was, as the Commissioner concedes, error, and given the significant weight ALJ Abrams placed on Dr. Jilhewar’s opinion, I cannot find that it was harmless. The doctrine of harmless error applies only when “it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency’s opinion failed to marshal that support.” *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

Here, I am not confident that ALJ Abrams would have found that Willoughby could not meet the continuous disability requirement had she properly found that Willoughby met a listing prior to the expiration of his coverage. The ALJ would have been required to consider whether Willoughby's disability ended because of medical improvement. *See* 20 C.F.R. § 404.1594(b)(1) (noting that medical improvement is a decrease in the severity of the impairment based on improvements in the symptoms or laboratory findings); 20 C.F.R. § 404.1594(f)(listing the evaluation steps for determining medical improvement). It is not clear on this record that it did; for example, on Oct. 5, 2006, Willoughby weighed 118 pounds and had a BMI of 17.4. To the extent the Commissioner is arguing that Willoughby waived any argument that he was continuously disabled on or before Dec. 31, 2006, and through Jan. 27, 2008, I cannot make such a finding on this record. Willoughby's testimony was that he has not worked since 2001 and that in 2007 and 2008, he weighed about 115 pounds. He did not contend there had been significant improvement in his condition since 2005, nor did ALJ Abrams consider that issue. Further, she may have viewed other evidence, including Willoughby's own testimony as to the severity of his symptoms, differently had she realized that he did in fact meet a listing during his coverage period. Dr. Jilhewar himself

testified that if Willoughby's BMI were consistently low, his opinion would have been different.

Because ALJ Abrams erred in her step three determination that Willoughby did not met or equal a listing through his date last insured, I cannot find her ruling to be supported by substantial evidence. *See Barry v. Barnhart*, No. 03 C 7239, 2004 WL 2092005, at **11–12 (N.D. Ill. Sept. 14, 2004) (remanding where the ALJ relied on a medical expert opinion that was based in part on mischaracterization of the record). Willoughby asks that I find him disabled and grant him benefits based on the record. When the ALJ's decision is not supported by substantial evidence, a remand for further proceedings is the proper remedy unless the evidence before me compels an award of benefits. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005) (internal citations omitted). An award of benefits is appropriate only when all the factual issues have been resolved and the record can yield but one conclusion. *Id.* Here, significant questions remain as to whether Willoughby remained disabled after meeting Listing 5.08 in early 2005. ALJ Abrams did not develop the record to address this question because she erroneously found that Willoughby was never disabled at any time prior to the expiration of his insurance. As such, remand is appropriate.

**B. Residual Capacity Finding**

Willoughby makes several contentions of error in regard to the ALJ's residual capacity assessment, two of which have at least some merit and are worth addressing in light of the remand.

As noted above, ALJ Abrams employed empty boilerplate as part of her finding that Willoughby was not credible to the extent his description of his symptoms was "inconsistent with the above residual functional capacity assessment." As the Seventh Circuit has held, this wrongly suggests that the ability to work is determined first, and then used to assess credibility. *Bjornson*, 671 F.3d at 645–46 (7th Cir. 2012). It also is in tension with Social Security Ruling 96-7p, which provides that a claimant's statements about the intensity and persistence of pain and symptoms or the effect those symptoms have on the ability to work cannot be disregarded solely because they are not substantiated by the medical evidence. *Id.* at 646.

ALJ Abrams did support her credibility finding with citations to the medical record. However, it appears that she based her conclusion that Willoughby's descriptions of his limitations were not credible in part on Dr. Jilhewar's erroneous opinion. The ALJ should reevaluate Willoughby's credibility in light of the fact that his weight loss was so significant that he met a listing in early 2005.

Additionally, in reaching her functional capacity assessment, ALJ Abrams gave little weight to the opinion of treating physician Dr. Harney, in part because she found, based on what appears to be an error on a medical assessment form, that Dr. Harney did not begin treating Willoughby until Dec. 31, 2006. ALJ Abrams then concluded that she could not tell whether Dr. Harney believed that Willoughby had certain limitations during the relevant time period before his date last insured. In fact, Dr. Harney had treated Willoughby since 2001. ALJ Abrams additionally found that the medical records did not support Dr. Harney's findings with regard to Willoughby's mental work limitations, nor did they clearly establish that Willoughby suffered from gastroparesis or pyloric stenonis.

The ALJ of course, is not required to accept Dr. Harney's suggested limitations if they are inconsistent with the medical evidence. A treating physician's opinion is entitled to "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). The ALJ may discount opinions based solely on the claimant's subjective complaints, see *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir. 2008), but must minimally articulate her reasons for doing so. *Skarbek v. Barnhart*, 390 F.3d 500, 503

(7th Cir. 2004). Nonetheless, given that the ALJ erred in finding that Dr. Harney had not treated Willoughby during the relevant time period, and given that she viewed the record through the lens of Dr. Jilhewar's erroneous opinion, she should re-evaluate the credibility of Dr. Harney's findings.

IV.

For the reasons stated, the Commissioner's motion for summary judgment (Dkt. No. 22) is denied. Willoughby's motion for summary judgment (Dkt. No. 19) is granted to the extent this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: July 12, 2012